ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4061
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>　　　　Plaintiff,<br>　　v.<br><br>MULAS DAIRY COMPANY, and MICHAEL MULAS,<br><br>　　　　Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387)** |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

**I.     JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act," "CWA" or "Act") against Mulas Dairy Company and Michael Mulas ("Defendants"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation). The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 1319(d) (civil

Complaint

1  penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual
2  controversy and further necessary relief based on such a declaration).

3      2.    On November 22, 2022, Plaintiff provided written notice to Defendants, via
4  certified mail, of Defendants' violation of the Act ("Notice Letter"), and of Plaintiff's intention
5  to file suit against Defendants, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R.
6  § 135.2(a)(1). Plaintiff mailed a copy of the Notice Letter to the Administrator of the United
7  States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the
8  Executive Director of the State Water Resources Control Board ("State Board"); and the
9  Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region
10 ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1). A true and correct copy of the Notice
11 Letter is attached hereto as **Exhibit 1** and is incorporated by reference.

12     3.    More than sixty days have passed since Plaintiff served the Notice Letter on
13 Defendants and the agencies. Plaintiff is informed and believes, and thereupon alleges, that
14 neither the EPA nor the State of California has commenced nor is diligently prosecuting a court
15 action to redress the violations alleged in this Complaint. This action's claims for civil penalties
16 are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. §
17 1319(g).

18     4.    Venue is proper in the Northern District of California pursuant to Section
19 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located
20 within this District. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of
21 the events or omissions giving rise to Plaintiff's claims occurred in this District. Intra-district
22 venue is proper in either San Francisco or Oakland, California, because the sources of the
23 violations are located within Sonoma County.

24 **II.  INTRODUCTION**

25     5.    This Complaint seeks relief for Defendants' violations of the CWA at
26 Defendants' approximately 300-acre dairy farming facility located at 2034 Fremont Drive in
27 Sonoma, California ("Facility"). Defendants discharge pollutant-contaminated storm water from
28 the Facility into an unnamed creek, which drains to Schell Creek, then to Steamboat Slough,

1 which is a tributary of the Second Napa Slough, which discharges to Sonoma Creek and
2 ultimately to San Pablo Bay and the Pacific Ocean.

3       6.      The unnamed creek, Schell Creek, Steamboat Slough, Second Napa Slough,
4 Sonoma Creek, San Pablo Bay and the Pacific Ocean (the "Impacted Waters") are waters of the
5 United States within the meaning of the CWA.

6       7.      Defendants are violating both the substantive and procedural requirements of the
7 CWA.

8       8.      Defendants' discharges of pollutant-contaminated storm water from the Facility
9 violate the Act and the State of California's General Industrial Permit for storm water discharges,
10 State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as
11 amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and
12 Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System
13 ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").

14       9.      Defendants' violations of the filing, monitoring, reporting, discharge and
15 management practice requirements, and other procedural and substantive requirements of the
16 General Permit and the Act are ongoing and continuous.

17       10.     The failure on the part of industrial facility operators, such as Defendants, to
18 comply with the General Permit is recognized as a significant cause of the continuing decline in
19 water quality of receiving waters. The general consensus among regulatory agencies and water
20 quality specialists is that storm water pollution amounts to more than half the total pollution
21 entering the aquatic environment each year. With every rainfall event, hundreds of thousands of
22 gallons of polluted storm water originating from industrial facilities discharge to the Impacted
23 Waters.

24 **III.     PARTIES**

25       11.     Plaintiff California Sportfishing Protection Alliance ("CSPA") is a non-profit
26 public benefit corporation organized under the laws of California, with its main offices in
27 Stockton, California. CSPA is dedicated to the preservation, protection, and defense of the
28 environment, wildlife, and natural resources of California waters, including the waters into

which Defendants discharge polluted storm water. To further its goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and directly initiates enforcement actions on behalf of itself and its members as necessary.

12. Members of CSPA—including citizens, taxpayers, property owners, and residents—live, work, travel, and recreate on and near the Impacted Waters, into which Defendants cause pollutants to be discharged. These members of CSPA use and enjoy the Impacted Waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. Defendants' discharges of storm water containing pollutants impairs each of those uses. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the General Permit.

13. Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities. Members of CSPA use and enjoy the Impacted Waters, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Members of CSPA use these areas to hike, fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the CWA. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities because that relief will significantly reduce pollution discharged from Defendants' Facility into the Impacted Waters.

14. Defendant Mulas Dairy Company is a corporation organized under California law.

15. Defendant Michael Mulas is the Chief Executive Officer of Mulas Dairy Company and also serves as its Agent for Service of Process.

16. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV. LEGAL BACKGROUND

### A. The Federal Clean Water Act

17. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

18. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge complies with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not in conformance with a NPDES permit, such as discharges without a NPDES permit or discharges that violate the terms of an NPDES permit issued pursuant to Section 402 of the Act (33 U.S.C. §1342).

19. The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

20. A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

21. "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Waters of the United States includes, among other things, waters that are, were, or are susceptible to use in interstate commerce and tributaries to such waters. 40 C.F.R. § 230.3 (2015).

22. Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program—a permitting program that regulates the discharge of pollutants into waters of the United States.

Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires a NPDES permit for storm water discharges associated with industrial activity. 33 U.S.C. § 1342(p)(2)(B). Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b).

23. Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [Section 402] of this title," and "any unlawful act under subsection (a) of [Section 301] of this title").

24. An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $59,973 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. §§ 19.1–19.4.

**B.    California's Industrial Storm Water General Permit**

25. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized the State Board to issue NPDES permits in California, including general permits.

26. On November 16, 1990, the EPA promulgated Phase I storm water regulation in compliance with section 402(p) of the Act. 55 Fed. Reg. 47990, codified at 40 C.F.R. § 122.26. These regulations require operators of facilities subject to storm water permitting that discharge storm water associated with industrial activity to obtain an NPDES permit. *Id*.

27. The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit

6

on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

28. To discharge storm water associated with industrial activities lawfully in California, industrial dischargers must obtain General Permit coverage and comply with the terms of the General Permit, or obtain and comply with an individual NPDES permit. 33 U.S.C. §§ 1311(a), 1342(p)

29. The industrial activities covered under the General Permit are described in Attachment A to the General Permit.

30. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI"). The General Permit requires new dischargers to register for NOI coverage at least seven days prior to the commencement of industrial operations. General Permit, Section II.B.5. Dischargers with active NOI coverage under Order No. 97-03-DWQ were required to register for NOI coverage under Order No. 2014-0057-DWQ by July 1, 2015. General Permit, Section II.B.4.b.

31. Dischargers registering for NOI coverage under the General Permit must certify and submit Permit Registration Documents ("PRD") via the Storm Water Multiple Application and Report Tracking System ("SMARTS") website. General Permit, Section II.B.

32. PRDs consist of a completed NOI and signed certification statement, a copy of a current site map from the Storm Water Pollution Prevention Plan ("SWPPP"), and a SWPPP. General Permit, Section II.B.1.b.

33. Dischargers registering for NOI coverage under the General Permit must also pay the appropriate annual fee in accordance with 23 C.C.R. § 2200 *et seq*. General Permit, Section II.B.1.c.

34. When PRDs are certified and submitted and the annual fee is received, the State Water Board will assign the discharger a Waste Discharger Identification ("WDID") number.

35. Once regulated by a NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit. A violation of the General Permit is a violation of the Act.

*See* General Permit, Section XXI.A.

36. Facilities covered by the General Permit include concentrated animal feeding operations ("CAFO"). General Permit, Attachment A.

37. To be considered a CAFO, a facility must first be defined as an animal feeding operation ("AFO") and meet the criteria established in the CAFO regulation. An AFO is an agricultural operation where animals are kept and raised in confined situations where the following conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility. 40 C.F.R. § 122.23(b)(1).

38. A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the terms of 40 C.F.R. § 122.23. An operation that confines dairy cows is considered a Large CAFO if the above conditions are met, and it stables or confines at least 700 mature dairy cattle, whether milked or dry. 40 C.F.R. § 122.23(b)(4)(i).

## V. STATEMENT OF FACTS

### A. The Mulas Dairy Company Facility

39. CSPA is informed and believes, and on that basis alleges, that Defendants own and operate the Facility, a dairy farm located near the town of Sonoma, in Sonoma County, California.

40. CSPA is informed and believes, and on that basis alleges, that Defendants' primary industrial activities at the Facility include operations associated concentrated animal feeding operation related to the production of organic and conventional milk. CSPA is informed, and on that basis, believes that the Facility stables or confines approximately 800 mature dairy cows and 400 calves for a total of 45 days or more in any 12-month period and crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot where the animals are confined.

41. CSPA is informed and believes, and on that basis alleges, that the Facility meets the definition of a Large CAFO.

42. CSPA is informed and believes, and on that basis, alleges that Defendants conduct industrial activities and store industrial materials outside in areas exposed to storm water, and operate heavy equipment associated with the production and management of its industrial materials.

43. CSPA is informed and believes, and on that basis alleges, that the Facility includes rows of buildings and corrals in which cows and calves are confined, wastewater processing, storage, and disposal facilities; manure processing, storage, and disposal facilities; a fueling station; a shop, and a network of roads that provide connectivity between the various industrial areas.

44. CSPA is informed and believes, and on that basis alleges, that the industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 0241 ("Dairy Farms").

45. CSPA is informed and believes, and on that basis alleges, that Defendants have operated the Facility under General Permit coverage since at least February 15, 2015.

46. CSPA is informed and believes, and on that basis alleges, that Defendants have certified, under penalty of perjury, that the Facility discharges to a receiving water they have identified as "Shell Slough".

47. CSPA is informed and believes, and on that basis alleges, that Defendants are currently operating their Facility under General Permit coverage as of the date of this complaint.

48. CSPA is informed and believes, and on that basis alleges, that the Facility collects and discharges storm water associated with industrial activity from the Facility through at least three (3) discharge points into an unnamed creek, which drains to Schell Creek.  Schell Creek discharges to Steamboat Slough, which is a tributary to Second Napa Slough, which ultimately discharges to Sonoma Creek, which drains to San Pablo Bay and the Pacific Ocean.

49. The Impacted Waters are waters of the United States within the meaning of the Clean Water Act.  40 C.F.R. § 120.2(3).

//

//

50. CSPA is informed and believes, and on that basis alleges, that the unnamed creek bisects a portion of a production area, as that term is defined at 40 C.F.R. § 122.23, at the Facility, as depicted in the picture below.



51. CSPA is informed and believes, and on that basis alleges, that during every Significant Rain Event[1] storm water discharges from the production area depicted above into the unnamed creek.

52. CSPA is informed and believes, and on that basis alleges, that during every Significant Rain Event pollutants from the production area are discharged to the unnamed creek.

**B.     The Facility's Storm Water Pollution Prevention Plan ("SWPPP")**

53. The State Board maintains the SMARTS database, where permitted dischargers are required to upload their SWPPP, sampling results, Annual Reports, and other compliance documents. Defendants' current SWPPP ("2015 SWPPP") was uploaded to SMARTS over seven years ago, on August 11, 2015. A true and correct copy of the 2015 SWPPP is attached hereto as **Exhibit 2**.

54. CSPA is informed and believes, and on that basis alleges, that the 2015 SWPPP is

---

[1] Significant Rain Events are defined in the Notice Letter attached hereto as **Exhibit 1** to mean any rain event totaling 0.1 inches or more of rainfall in a 24-hour period.

10

currently the operative SWPPP for the Facility, and has been since at least August 11, 2015.

55. The 2015 SWPPP consists of an extensively hand-marked copy of Appendix 1 of the General Permit (a six-page checklist for gathering information in the preparation of a SWPPP); pages 4, 16 and 17 of their Emergency Response Plan; and five pages of facility maps.

56. The 2015 SWPPP fails to identify a single "Best Management Practice" regarding storm water management at the Facility, and does not contain a BMP summary table.

57. The 2015 SWPPP contains none of the information required by Section X of the General Permit, and instead addresses a host of tangential issues -- wastewater (discharges of which are prohibited under the General Permit), biosecurity, emergency spills, and catastrophic animal mortality. A number of pages of the 2015 SWPPP, including the "Background and Site Information" appear to be copies of select pages of an "Emergency Response Plan" unrelated to storm water laws and regulations.

58. The 2015 SWPPP fails to identify a Pollution Prevention Team, or to include procedures to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable.

59. The 2015 SWPPP fails to identify the Facility's operating hours.

60. The 2015 SWPPP fails to identify any storm water drainage areas within the Facility's boundaries or identify any flow directions of each drainage area.

61. The 2015 SWPPP fails to provide enough information in the site maps to determine the specific boundaries of surface water bodies located on-the Facility, to identify areas of soil erosion at the Facility, or to identify all locations of storm water collection and conveyance systems at the Facility.

62. The 2015 SWPPP fails to identify the locations and descriptions of all structural control measures that affect industrial storm water discharges.

63. The site maps contained in the 2015 SWPPP do not identify all impervious areas of the Facility.

64. The site maps contained in the 2015 SWPPP do not identify all locations where materials are directly exposed to precipitation.

11

1    65.   The site maps contained in the 2015 SWPPP do not identify all areas of industrial
2 activity subject to the General Permit.
3    66.   The site maps contained in the 2015 SWPPP do not identify all shipping and
4 receiving areas of the Facility.
5    67.   The site maps contained in the 2015 SWPPP do not identify all vehicle and
6 equipment storage/maintenance areas of the Facility.
7    68.   The site maps contained in the 2015 SWPPP do not identify all material handling
8 and processing areas of the Facility.
9    69.   The site maps contained in the 2015 SWPPP do not identify all dust or particulate
10 generating areas.
11    70.   The site maps contained in the 2015 SWPPP do not identify do not identify all
12 cleaning and material reuse areas of the Facility.
13    71.   The site maps contained in the 2015 SWPPP do not identify all areas of industrial
14 activity that may have potential pollutant sources.
15    72.   The 2015 SWPPP fails to include a complete list of industrial materials handled at
16 the Facility, and the locations where each material is stored, received, shipped, and handled, as
17 well as the typical quantities and handling frequency.
18    73.   The 2015 SWPPP fails to include a complete description of potential pollutant
19 sources at the Facility.
20    74.   The 2015 SWPPP fails to include a complete assessment of potential pollutant
21 sources at the Facility.
22    75.   CSPA is informed and believes, and on that basis alleges that Defendants have
23 either not revised their SWPPP since August 15, 2011, or have failed to certify and submit via
24 SMARTS any revised SWPPP since that date.
25 //
26 //
27 //
28 //

## VI. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Discharges of Contaminated Storm Water from the Facility**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

76. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

77. Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

78. Plaintiff is informed and believes, and thereupon alleges, that since at least November 22, 2017, Defendants have been discharging polluted storm water from the Facility into the Impacted Waters, in violation of the General Permit.

79. During every Significant Rain Event, storm water flowing over and through materials and production areas at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into the Impacted Waters.

80. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

81. Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

82. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, and/or the applicable Regional Board's Basin Plan, in violation of Receiving Water Limitation VI.A of the General Permit.

83. Plaintiff is informed and believes, and thereupon alleges, that every day since November 22, 2017, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

84. Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 22, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

85. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

86. Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

87. Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, inter alia, the allegations set forth in paragraphs 53 through 75 above.

88. Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.

89. Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

90. Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each

and every violation of the Act since November 22, 2017.  See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

### THIRD CLAIM FOR RELIEF
### Failure to Develop and Implement the Best Available And Best Conventional Treatment Technologies at the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

91.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

92.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

93.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of Total Suspended Solids, Oil & Grease, pH, and nitrate plus nitrite nitrogen in violation of Effluent Limitation V.A of the General Permit.

94.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

95.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

96.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least November 22, 2017.  Defendants are subject to civil penalties for each and every violation of the Act since November 22, 2017.  See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

### FOURTH CLAIM FOR RELIEF
### Failure to Implement an Adequate Monitoring Implementation Plan for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

97.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

98.     Section X.I and Section XI.A-D of the General Permit require dischargers of

15

storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

99. Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility. Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, inter alia, their continuing failure to collect and analyze storm water samples from all discharge locations, and their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, as the General Permit requires.

100. Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility every day since at least November 22, 2017. These violations are ongoing and continuous.

101. Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendants are subject to civil penalties for each and every violation of the Act since November 22, 2017. See 33 U.S.C. §§ 1319 (d), 1365; 40 C.F.R. § 19.4 (2008).

## VII.  RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a. Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facility not in compliance with a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342;

b. Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the General Permit and the Clean Water Act;

c. Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit and the Clean Water Act;

d. Order Defendants to pay civil penalties of $59,973 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the

Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4;

  e. Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by its activities;

  f. Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

  g. Award any such other and further relief as this Court may deem appropriate.

Dated: January 23, 2023     Respectfully Submitted,

           LAW OFFICES OF ANDREW L. PACKARD

           By: /s/ William N. Carlon

           William N. Carlon
           Attorney for Plaintiff
           CALIFORNIA SPORTFISHING
           PROTECTION ALLIANCE