ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel.: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

Attorneys for Plaintiff
California Sportfishing Protection Alliance

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>MULAS DAIRY COMPANY, et al,<br><br>Defendants. | No.  3:23-cv-00338-AGT<br><br>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A STAY OF THE ACTION<br><br>**Date:** August 4, 2023<br>**Time:** 10:00 a.m.<br>**Judge:** Hon. Alex G. Tse |

# TABLE OF CONTENTS

**I.     INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED** .....................5

**II.    LEGAL BACKGROUND** ................................................................................7

   **a.    The Clean Water Act** ............................................................................ 7

   **b.    Storm Water Associated with Industrial Activity** ................................ 7

   **c.    The General Permit** .............................................................................. 8

   **d.    Concentrated Animal Feeding Operations** ........................................... 9

**III.   FACTUAL AND PROCEDURAL BACKGROUND** ...................................9

   **a.    Defendants Discharge Storm Water Associated with Industrial Activity, Containing Pollutants, from Point Sources to Waters of the United States** ..................... 9

   **b.    This Citizen Enforcement Action** ........................................................ 10

**IV.    STANDARD OF REVIEW** ..........................................................................11

   **a.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)** ................... 11

   **b.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)** ................... 11

**V.     ARGUMENT** ...............................................................................................12

   **a.    This Court Has Subject Matter Jurisdiction to Enforce Defendants' Discharges that Continue to Occur Without NPDES Permit Compliance** ........................................... 12

      *i.    Defendants Remain Subject to the General Permit* ....................................... 12

      *ii.   Defendants Will Remain Liable for Civil Penalties, Even After Closure or Permit Termination* ...................................................................................... 13

      *iii.  Defendants' Notice of Termination Does Not, and Will Not, Deprive this Court of Subject Matter Jurisdiction* .......................................................... 14

   **b.    The Complaint Contains Extensive Factual Allegations Setting Forth a Claim for Relief Under Clean Water Act § 505** ....................................................... 17

      *i.    Defendants Are "Persons" Under the Clean Water Act* ................................ 17

      *ii.   Defendants' Discharges of Storm Water from Its CAFO Are "Discharges" Under the Clean Water Act* ............................................................. 18

      *iii.  Defendants' Storm Water Discharges Contain "Pollutants"* ........................ 18

      *iv.   Defendants Discharge Storm Water to Navigable Waters* .......................... 19

      *vi.   Defendants Discharge Storm Water in Violation of the Requirements of a NPDES Permit* ........................................................................... 21

   **c.    The Matter Should Not Be Stayed** .................................................... 22

**VI.    CONCLUSION** ...........................................................................................23

1

## **TABLE OF AUTHORITIES**

2

3 **CASES**

4
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 11

*Ass'n to Protect Hammersley v. Taylor Res.*, 299 F.3d 1007 (9th Cir. 2002) ........................... 15

5
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 11

6
*Clinton v. Jones*, 520 U.S. 681 (1997) ................................................................... 22

7
*Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305 (9th Cir. 1993) ........................................................................................................... 17

8
*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................... 11

9
*Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) ...................... 7

*EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200 (1976)............................... 7

10
*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000).......................................... 12, 14

11
*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987) ................. 12

12
*Idaho Conservation League v. Atlanta Gold Corp.*, 844 F. Supp. 2d 1116 (D. Idaho 2012) ...................................................................................................... 13, 14

13
*Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 826 (9th Cir. 2021)................. 17, 21

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ....................................................... 17

14
*Landis v. North American Co.*, 299 U.S. 248 (1936)..................................................... 22

15
*Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580 (9th Cir. 2008) ..................................... 11

16
*Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir. 2005)............................................... 22

17
*Northern Cal. River Watch v. Oakland Mar. Support Servs.*, No. C 10-03912 CW, 2011 U.S. Dist. LEXIS 14551, 2011 WL 566838 (N.D. Cal. Feb. 14, 2011) ...................... 18

18
*NRDC v. Cnty. of L.A.*, 725 F.3d 1194 (9th Cir. 2013)................................................. 7

19
*NRDC v. EPA*, 966 F.2d 1292 (9th Cir. 1992)........................................................... 8

*NW Env't Advocs. v. City of Portland*, 56 F.3d 979 (9th Cir. 1995) ............................. 17

20
*Paolino v. JF Realty, LLC*, 710 F.3d 31, 2013 U.S. App. LEXIS 5142, 2013 WL 951257 (1st Cir. Mar. 13, 2013)................................................................................ 20

21
*Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337 (S.D. N.Y. 2009) ............... 13, 14

22
*Roberts v. Corrothers,* 812 F.2d 1173 (9th Cir. 1987).................................................. 11

23
*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004)....................................... 11

*San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700 (9th Cir. 2007) ........................ 15

24
*San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002)............... 13, 14, 15, 20

25
*San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719 (N.D. Cal. 2011) ......................................................................................................... 17, 18

26
*United States v. Iverson*, 162 F.3d 1015 (9th Cir. 1998) ........................................... 18

27
*WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913 (9th Cir. 2004)................................. 7

28
*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)........................................................... 11

*Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold and Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090 (9th Cir. 2008) .................................................................................................................... 12

**STATUTES**

33 U.S.C. § 1251(a) ............................................................................................................ 7

33 U.S.C. § 1311(a) ..................................................................................................... 7, 22

33 U.S.C. § 1317(a)(1) ...................................................................................................... 19

33 U.S.C. § 1319(c)(6) ...................................................................................................... 18

33 U.S.C. § 1342 ......................................................................................................... 8, 22

33 U.S.C. § 1342(k) .......................................................................................................... 22

33 U.S.C. § 1362(12) .................................................................................................... 8, 19

33 U.S.C. § 1362(14) ............................................................................................. 8, 20, 21

33 U.S.C. § 1362(5) ........................................................................................................... 18

33 U.S.C. § 1362(6) ..................................................................................................... 8, 19

33 U.S.C. § 1362(7) ........................................................................................................... 20

**RULES**

Fed. R. Civ. P. 1 ............................................................................................................... 23

Fed. R. Civ. P. 12(b)(1) .................................................................................................... 23

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 23

**REGULATIONS**

40 C.F.R. § 120.2(a) .......................................................................................................... 19

40 C.F.R. § 120.2(a)(3) ..................................................................................................... 19

40 C.F.R. § 120.2(a)(4) ..................................................................................................... 19

40 C.F.R. § 122.23 ....................................................................................................... 9, 20

40 C.F.R. § 122.23(b)(1) ..................................................................................................... 9

40 C.F.R. § 122.23(b)(4)(i) ................................................................................................. 9

40 C.F.R. § 122.26(a)(ii) ..................................................................................................... 7

40 C.F.R. § 122.26(b)(14) ............................................................................................ 7, 8

40 C.F.R. § 135.3(a) .......................................................................................................... 20

40 C.F.R. § 401.15 ............................................................................................................. 18

40 C.F.R. § 401.15(44) ...................................................................................................... 18

40 C.F.R. § 401.15(65) ...................................................................................................... 18

40 C.F.R. § 401.16 ............................................................................................................. 18

40 C.F.R. § 412 .................................................................................................................... 8

1

## I.   INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

2   The Clean Water Act ("Act") prohibits all discharges of pollutants from point sources to

3   waters of the United States except in accordance with the terms of a National Pollutant Discharge

4   Elimination System ("NPDES") permit.  The Act also confers jurisdiction on the federal district

5   courts to hear citizen suit enforcement suits against any person alleged to be either violating the

6   terms of a NPDES permit or discharging pollutants without such a permit.

7   Defendants own a large dairy farm in Sonoma County, and have operated it for the better

8   part of a century.  At the time of the filing of the Complaint, and for several months thereafter,

9   Defendants confined well over the number of mature dairy cows and heifers to be defined as a

10   Large Concentrated Animal Feeding Operation ("CAFO").  For many years, and at least since

11   November 27, 2017 – the beginning of the statute of limitations in this case – Defendants have

12   operated their dairy under the General Permit for Storm Water Discharges Associated with

13   Industrial Activities ("General Permit").  Over the years, Defendants have submitted documents

14   to the San Francisco Bay Regional Water Quality Control Board ("Regional Board") that purport

15   to comply with the requirements of the General Permit, including sample results of storm water

16   discharges.  Now, after the commencement of this litigation, Defendants say they no longer need

17   General Permit coverage.  This, despite the fact that a creek *runs through* Defendants' animal

18   confinement area.

19   Defendants move to dismiss this action on the basis that once their Notice of Termination

20   is approved by the Regional Board, the Court will no longer have subject matter jurisdiction.

21   Plaintiff opposes this Motion because (1) the Notice of Termination has not yet been approved,

22   and Defendants remain subject to the General Permit; (2) even if the Notice of Termination does

23   get approved, Defendants will remain liable for civil penalties under the Act; and, (3) the Notice

24   of Termination is not likely to be approved because Defendants submitted an invalid application.

25   Defendants also move on the basis that once their sale of the herd and closure of the dairy

26   is completed, there will be no facility to regulate, and therefore the Court will be deprived of

27   subject matter jurisdiction.  Plaintiff opposes this Motion on those grounds because (1) the herd

28   has not yet been removed from the facility; (2) the dairy has not yet been closed; (3) even if the

1    herd is removed, and the dairy closed, Defendants will remain liable for civil penalties under the

2    Act; and (4) Defendants could resume their unlawful pollution discharges by simply

3    reintroducing cows to the dairy, and starting the operation back up again after this litigation is

4    resolved.

5         Defendants also argue that CSPA's complaint fails to state a claim upon which relief can

6    be granted for the same two reasons discussed above, and because Plaintiff's Complaint and 60-

7    Day Notice of Intent to File Suit ("Notice Letter") lack sufficient detail regarding what Plaintiff

8    alleges the point sources to be.  Plaintiff's Complaint adequately alleges violations of the Clean

9    Water Act, both as to discharge violations and procedural "paper" violations.  Both Plaintiff's

10   Notice Letter and Complaint provide ample details and information, including a color

11   photograph, of the alleged point sources.

12        Defendants argue in the alternative that the Court should stay this case to allow

13   Defendants more time to either get a decision from the Regional Board about the Notice of

14   Termination, or to complete the closure of the dairy.  Defendants have not met their burden to

15   show why a stay is necessary or appropriate here, and, in fact, a stay would have no effect on

16   Defendants' liability, except to allow them more time to accrue additional violations.

17        The issues to be decided in connection with this Motion are:

18        1.  Whether this Court has subject matter jurisdiction over the claims because the events

19            that Defendants argue would deprive the Court of subject matter jurisdiction have not

20            yet come to pass;

21        2.  Whether this Court has subject matter jurisdiction over the claims because even if

22            those events do come to pass, they would not actually deprive the Court of subject

23            matter jurisdiction;

24        3.  Whether the Complaint adequately states a claim for relief under the Clean Water Act;

25        4.  Whether a stay is appropriate where the events have no impact on Defendants' liability

26            under the Clean Water Act.

27   //

28   //

1      **II.**    **LEGAL BACKGROUND**

2        **a.**   **The Clean Water Act**

3        Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical,

4  physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end,

5  section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a

6  point source into waters of the United States, unless such discharge is in compliance with the

7  terms of a NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. §

8  1342. The term "discharge of pollutants" means "any addition of any pollutant to navigable

9  waters from any point source." 33 U.S.C. § 1362(12). Pollutants include but are not limited to

10  industrial waste, chemical waste, biological materials, heat, rock, and sand discharged into water.

11  33 U.S.C. § 1362(6). A "point source" is "any discernible, confined and discrete conveyance,

12  including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure,

13  container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft,

14  from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Thus, "[u]nder the

15  NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and

16  complying with its terms." *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205

17  (1976). "The discharge of pollutants without an NPDES permit, or in violation of a permit, is

18  illegal." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 916 (9th Cir. 2004) (citing

19  *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000)); *see also*

20  *NRDC v. Cnty. of L.A.*, 725 F.3d 1194, 1198 (9th Cir. 2013) ("In nearly all cases, an NPDES

21  permit is required before anyone may lawfully discharge a pollutant from a point source into the

22  navigable waters of the United States.").

23        **b.**   **Storm Water Associated with Industrial Activity**

24        In 1987, the Act was amended to establish a framework for regulating storm water

25  discharges through the NPDES program. *WaterKeepers N. Cal v. AG Indus. Mfg.*, 375 F.3d at

26  916. An NPDES permit is required for any storm water "discharge associated with industrial

27  activity." 40 C.F.R. § 122.26(a)(ii). "Storm water discharge associated with industrial activity"

28  is defined by regulation as "[t]he discharge from any conveyance that is used for collecting and

1   conveying storm water and that is directly related to manufacturing, processing, or raw materials

2   storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).  This definition is "very broad"

3   with the "operative word" being "*associated*."  *NRDC v. EPA*, 966 F.2d 1292, 1304 (9th Cir.

4   1992).  For a permit to be required, "[i]t is not necessary that storm water be contaminated or

5   come into direct contact with pollutants; only association with any type of industrial activity is

6   necessary."  *Id.*  Storm water is associated with industrial activity if it is associated with an

7   activity classified within any one of a number of specified Standard Industrial Classification code

8   categories, or if it is associated with a facility subject to storm water effluent limitations

9   guidelines, new source performance standards, or toxic pollutant effluent standards found in 40

10  Code of Federal Regulations, Chapter I, Subchapter N.  40 C.F.R. § 122.26(b)(14).  "Feedlots," or

11  CAFOs, are among the facilities subject to the standards above, *see* 40 C.F.R. § 412, and

12  therefore generate storm water associated with industrial activity that is subject to NPDES

13  permitting requirements.  General Permit, Attachment A.

14          **c.  The General Permit**

15          In California, the United States Environmental Protection Agency ("EPA") has delegated

16  its authority to issue NPDES permits to the California State Water Resources Control Board

17  ("SWRCB"), and the SWRCB has issued a statewide NPDES "General Permit for Storm Water

18  Discharges Associated with Industrial Activity."  NPDES General Permit No. CAS000001,

19  SWRCB Water Quality Order No. 2014-0057-DWQ as amended by Order 2015-0122-DWQ and

20  Order No. 20XX-XXXX-DWQ ("General Permit").  Dischargers subject to the General Permit

21  enroll in either Notice of Intent ("NOI") coverage or No Exposure Certification ("NEC")

22  coverage.  General Permit, Section II.B.  Dischargers that discharge storm water associated with

23  industrial activity to waters of the United States are required to enroll in NOI coverage.  *Id.* at

24  Section II.B.1.

25          The General Permit contains three primary and interrelated categories of requirements: (1)

26  discharge of prohibitions, receiving water limitations and effluent limitations; (2) Storm Water

27  Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting

28

requirements.[1]  *See* General Permit, Sections X-XII.

Dischargers with NOI coverage can request termination of coverage under the General Permit when (a) operation of the facility has been transferred to another entity; (b) the facility has ceased operations, completed closure activities, and removed all industrial related pollutants; or, (c) the facility's operations have changed and are no longer subject to the General Permit. General Permit, Section II.C.1.  Until a valid notice of termination is received, the Discharger remains responsible for compliance with the General Permit.  *Id.*

### d.  Concentrated Animal Feeding Operations

To be considered a CAFO, a facility must first be defined as an animal feeding operation ("AFO") and meet the criteria established in the CAFO regulations.  An AFO is an agricultural operation where animals are kept and raised in confined situations where the following conditions are met: (1) animals have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period; and, (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.  40 C.F.R. § 122.23(b)(1).

A CAFO is an AFO that is defined as a Large CAFO or as a Medium CAFO by the terms of 40 C.F.R. § 122.23.  An operation that confines dairy cows is considered a Large CAFO if the above conditions are met, and it stables or confines at least 700 mature dairy cattle, whether milked or dry.  40 C.F.R. § 122.23(b)(4)(i).

### III.  FACTUAL AND PROCEDURAL BACKGROUND
#### a.  Defendants Discharge Storm Water Associated with Industrial Activity, Containing Pollutants, from Point Sources to Waters of the United States

Defendants own and operate a dairy with a herd of approximately 725 mature dairy cows and approximately 550 heifers. ECF No. 23-7 at 2.  For the past 12 months, the cows have been confined for at least 45 days in areas at the facility where no crops or vegetation are sustained in the normal growing season.  ECF No. 1 at ¶ 40.

---

[1] The General Permit is available at: https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/industrial/unoff_igp_amend.pdf

On or about February 15, 2015, Defendants submitted an NOI[2] for the dairy farm to the Regional Board and have been enrolled under the General Permit continuously since that time. Declaration of William Carlon in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss, or, in the Alternative, for a Stay of the Action ("Carlon Decl."), Exh. 1.  The NOI form includes a section where the discharger is required to identify the receiving water into which they discharge storm water associated with industrial activity.  *Id.*  Defendants filled in that portion of the form, stating that the facility "indirectly" discharges to "Shell Slough" [sic].  *Id.*  Defendant Michael Mulas, on behalf of Defendant Mulas Dairy Company, certified the NOI under penalty of perjury.  *Id.*, *see* General Permit, Sections II.A.1, XXI.K.  Defendants submitted a document that purports to be a Storm Water Pollution Prevention Plan ("SWPPP") to the Regional Board on or about August 11, 2015.  ECF No. 1-2.  Over the intervening years, Defendants have submitted storm water sampling results to the Regional Board.  ECF No. 1-1 at 7-8.

Paragraph 50 of the Complaint shows an aerial photograph of the dairy.  Depicted in that photograph, along the eastern boundary of the dairy there is an unnamed creek that runs north to south.  *Id.*  This unnamed creek bisects a portion of Defendants' production area – that is, an open lot used to confine animals.  *Id.*  Storm water that falls within this production area flows into the unnamed creek, and is discharged to the south.  ECF No. 1 at ¶ 51.  During every significant rain event, Defendants discharge pollutants associated with the dairy, including pathogens, total suspended solids, nutrients, oil and grease, and pH, from the production area into this unnamed creek.  *Id.* at ¶ 52.

### b.  This Citizen Enforcement Action

On November 22, 2022, Plaintiff provided written notice to Defendants, via certified mail, and to all required agencies, of Defendants' violations of the Act.  ECF No. 1 at ¶ 2.  Defendants retained counsel and settlement discussions commenced.  Carlon Decl. at ¶ 3.  The case did not settle, and Plaintiff filed its Complaint on January 23, 2023.  *Id.* at ¶ 4.  The same day,

---

[2] A completed NOI and signed certification statement are among the required Permit Registration Documents that a discharger is required to submit to the Regional Board in order to obtain NOI coverage under the General Permit.  General Permit, Section II.B.1.b.i.

1   Defendants submitted their Notice of Termination to the Regional Board.  ECF No. 23-6 at 2-4.

2        The parties agreed to seek a referral to Chief Magistrate Judge Spero for an early

3   settlement conference, now scheduled for June 22, 2023.  Carlon Decl. at ¶ 5.  Defendants re-

4   noticed the hearing for this Motion to August 4, 2023, but declined to enter into a stipulation

5   moving the briefing schedule such that the parties' opposition and reply briefs would be due after

6   the settlement conference.  Carlon Decl. at ¶ 6.

7        **IV.    STANDARD OF REVIEW**

8              **a.   Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)**

9        When ruling on a factual challenge to the Court's subject matter jurisdiction under Rule

10  12(b)(1), the Court may look beyond the complaint to matters of public record without having to

11  convert the motion into one for summary judgment.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

12  2000).  In a factual challenge, as here, the challenger disputes the truth of the allegations that, by

13  themselves, would otherwise invoke federal jurisdiction.  *Safe Air for Everyone v. Meyer*, 373

14  F.3d 1035, 1039 (9th Cir. 2004).  However, a "jurisdictional finding of genuinely disputed facts is

15  inappropriate when the jurisdictional issue and substantive issues are so intertwined that the

16  question of jurisdiction is dependent on the resolution of factual issues going to the merits of the

17  action." *Id.*  "The question of jurisdiction and the merits of an action are intertwined where a

18  statute provides the basis for both the subject matter jurisdiction of the federal court and the

19  plaintiff's substantive claim for relief." *Id.* (internal quotation omitted). Thus, granting a 12(b)(1)

20  motion would only be "appropriate 'where it appears beyond doubt that the plaintiff can prove no

21  set of facts in support of his claim which would entitle him to relief.'" *Roberts v. Corrothers,* 812

22  F.2d 1173, 1177 (9th Cir. 1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

23              **b.   Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

24        In ruling on a motion to dismiss for a failure to state a claim under Rule 12(b)(6) of the

25  Federal Rules of Civil Procedure, this Court's "inquiry is limited to the allegations in the

26  complaint, which are accepted as true and construed in the light most favorable to the plaintiff."

27  *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  To defeat a 12(b)(6) motion,

28  Plaintiff's complaint need only contain "a short and plain statement of the claim showing that the

1   pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint is sufficient if it "contain[s]

2   sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v.*

3   *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

4   In making its determination, the Court "may generally consider only allegations contained in the

5   pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."

6   *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold and Easement in*

7   *the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1096 (9th Cir. 2008) (citation

8   omitted).

9   **V.     ARGUMENT**

       **a.  This Court Has Subject Matter Jurisdiction to Enforce Defendants'**
10          **Discharges that Continue to Occur Without NPDES Permit Compliance**

11          The Clean Water Act grants federal courts subject matter jurisdiction over citizen suits.

12  *See* 33 U.S.C. § 1365 ("The district courts shall have jurisdiction . . . to enforce an effluent

13  standard or limitation . . . .").  The Court has jurisdiction where a plaintiff makes "a good faith

14  allegation of continuous or intermittent violation." *Gwaltney of Smithfield, Ltd. v. Chesapeake*

15  *Bay Found., Inc.*, 484 U.S. 49, 64 (1987).  In other words, the complaint must allege "a

16  reasonable likelihood that a past polluter will continue to pollute in the future." *Id*. at 57.

17  Defendants argue that Plaintiff's claims are moot because (1) Defendants have sought to

18  terminate their permit coverage; and, (2) Defendants are purportedly selling off their herd and

19  closing down operations.  These arguments fail as a matter of law because none of the events that

20  Defendants allege have caused Plaintiff's action to become moot have come to pass, and because

21  Defendants have failed to meet their heavy burden of showing that the Court is unable to order

22  effective relief.

23               ***i.  Defendants Remain Subject to the General Permit***

24          In *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000), the Supreme Court explained the

25  "heavy burden" that a polluter faces in arguing that a Clean Water Act citizen suit has become

26  moot due to its post-complaint actions.[3] *Id*. at 189.  Once a lawsuit has commenced, the Supreme

27  _____

28  [3]  Notably, Defendants' do not address *Laidlaw* or its progeny in their Motion, even though the
    Ninth Circuit has described *Laidlaw* as the "touchstone for an analysis of mootness in citizen suits

Court explained, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Id*. at 174.  This is because, first, it must be "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 189 (citation omitted; emphasis added).  Here, Defendants have admitted that they are still waiting on Regional Board approval for their Notice of Termination and that they have not yet sold the herd, and do not plan to close the facility until October 31, 2023.  ECF No. 23 at 15:1-2.

### ii.   *Defendants Will Remain Liable for Civil Penalties, Even After Closure or Permit Termination*

Even if Defendants are able to terminate permit coverage and close the facility, they will remain liable for their extensive permit violations and are subject to civil penalties.  The Ninth Circuit has explained that, after a complaint is filed, even the fact that "a new operator takes over the facility does not make 'the deterrent effect of civil penalties any less potent,'. . . because an imposition of civil penalties against [defendant] for its pollution at the facility will demonstrate to [new owner] and any future owner that violations at this same facility will be costly." *San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002).

In *Tosco*, the defendant sold the facility after plaintiff filed suit under the Clean Water Act.  Even though the defendant no longer owned the Facility and could not violate the Clean Water Act in the future, the Court held that because "[l]iability for civil penalties attaches at the time of the violation," the case was not moot.  *Id.*  The court reasoned that a finding of mootness was unwarranted because it could "allow repeated violations that would evade review, and would substantially weaken the ability of citizen suits and civil penalties to police and deter the conduct forbidden under the Act."  *Id.*  Similarly, in *Laidlaw*, the defendant's closure of the facility at issue, after it had come into compliance with its permit, did not necessarily moot the case.  528 U.S. at 193.

In *Idaho Conservation League v. Atlanta Gold Corp.*, 844 F. Supp. 2d 1116 (D. Idaho 2012) a citizen enforcer's claims under the Clean Water Act were not mooted where defendant

---

under the Clean Water Act."  *San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1159 (9th Cir. 2002).

1   was in the process of terminating its NPDES permit, but had not yet successfully terminated

2   coverage.  *Id.* at 1134.  The court in *Idaho Conservation League* compared the facts there to the

3   facts in *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337 (S.D. N.Y. 2009), where the

4   court ruled that a citizen enforcer's claims under the Clean Water Act were moot because

5   defendant had produced undisputed evidence that the generating station at issue in the case had

6   been shut down *and demolished*.

7          Here, Defendants have not yet closed the facility and have not yet terminated permit

8   coverage.  These facts are even simpler to resolve than what the Ninth Circuit grappled with in

9   *Tosco*, where the defendant no longer owned the facility.  Defendants still own their facility, *and*

10  *are still operating it*.  As in *Idaho Conservation League,* Defendants have not yet obtained the

11  termination of the NPDES permit.  While Defendants wait for the Regional Board's approval of

12  their NOT, which is unlikely, as discussed below, they continue to operate their facility and

13  violate the General Permit.  Compared to the defendant in *Riverkeeper* who had demolished the

14  facility prior to moving for dismissal, Defendants here do not come close to meeting their burden

15  because they have not demolished the facility, do not have any stated plans to demolish the

16  facility, and could, if they eventually do actually close the facility, decide to resume operations in

17  the future with relative ease.

18              ***iii.  Defendants' Notice of Termination Does Not, and Will Not, Deprive this***
                 ***Court of Subject Matter Jurisdiction***

19         Even if the Regional Board approves the Notice of Termination, which is not likely for the

20  reasons discussed below, Defendants would still be liable for civil penalties under the Act.  The

21  Supreme Court, in *Laidlaw*, wrote that civil penalties under the Clean Water Act "serve, as an

22  alternative to an injunction, to deter future violations and thereby redress the injuries that

23  prompted a citizen suitor to commence litigation."  *Laidlaw*, 528 U.S. at 174.  "That a defendant

24  ceases illegal conduct following the commencement of suit 'ordinarily does not suffice to moot a

25  case' because civil penalties still serve as deterrent to future violations."  *S.F. Baykeeper v. Tosco*

26  *Corp.*, 309 F.3d at 1159-60.  "Liability for civil penalties attaches at the time of the violation.

27  Allowing polluters to escape liability for civil penalties for their past violations by selling their

28  polluting assets would undermine the enforcement mechanisms established by the Clean Water

Act." *Id.* at 1160.  The Ninth Circuit in *Tosco* wrote, "If we were to find this case against Tosco

moot, not only would Tosco be able to escape the consequences of its pollution, but any

subsequent owner could continue the illegal pollution, confident in its ability to escape any

potential monetary sanctions by re-selling the Diablo facility in its turn.  A finding of mootness

here could thus allow repeated violations that would evade review, and would substantially

weaken the ability of citizen suits and civil penalties to police and deter the conduct forbidden

under the Act." *Id.*

Defendants seek to avoid the consequences of their pollution by terminating their permit

coverage and selling their herd.  If the Court grants their motion, they could continue their illegal

pollution by purchasing a new herd of cows (or even purchasing back their own herd), and

resuming their operations, confident in their ability to escape any potential monetary sanction by

re-selling the herd in the future.

The fact remains, however, that the Notice of Termination has not yet been approved, and

Defendants are still responsible for compliance with the General Permit.  Moreover, whether

Defendants need a permit under the Clean Water Act is a determination that this Court must make

in the first instance, regardless of whether the Regional Board has effectively terminated their

permit coverage.  *See, e.g., San Francisco Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th

Cir. 2007) (holding that "a court may, in entertaining a citizen suit, decide whether a discharge of

particular matter into navigable waters violates the Clean Water Act even though the regulating

agency determined that the discharge was not subject to the requirement of a permit"); *Ass'n to

Protect Hammersley v. Taylor Res.*, 299 F.3d 1007, 1012-1013 (9th Cir. 2002) (holding that the

fact that Washington Department of Ecology "decided that an NPDES permit is not needed …

does not divest the federal courts of jurisdiction" because "neither the text of the Act nor its

legislative history expressly grants to the EPA or such a state agency the exclusive authority to

decide whether the release of a substance into the waters of the United States violates the Clean

Water Act").

The Notice of Termination is fatally flawed, and is therefore not "valid."  The form used

by Defendants contains options for the "Basis of Termination" that include, (1) "Closed Facility:

1    The facility is closed and all closure, moving, and clean-up activities are complete"; (2)

2    "Regulated By Another Permit: Discharge of storm water associated with industrial activity is

3    specifically regulated by another general or individual NPDES permit"; (3) "New

4    Owner/Operator"; and, (4) "Notice of Non-Applicability."  ECF No. 23-6.  Defendants did not

5    select the first basis, presumably because Defendants have admitted that the facility is not yet

6    closed, and so they could not submit a valid Notice of Termination until such time as all closure,

7    moving, and clean-up activities are complete.  *Id.*  Defendants did not select the second basis for

8    termination, presumably because the WDR for Confined Animal Facilities Order No. R2-2016-

9    0031 explicitly does not regulate the discharge of pollutants to waters of the United States, and

10   requires discharges to obtain NPDES coverage for such discharges.  *Id.*, *see also* ECF No. 23-4 at

11   3.  Therefore, no other permit regulates their discharges.  Defendants did not select "Notice of

12   Non-Applicability" as the basis for termination, though they now argue that they do not discharge

13   to waters of the United States.  ECF No. 23-6.  Were that the basis for termination, Defendants

14   would have to resubmit the Notice of Termination with the new basis provided.

15          The sole basis for Defendants' Notice of Termination is "Other: The dairy is enrolled in

16   and complies with R2-2016-0031."  ECF No. 23-6.  As stated above, the WDR does not regulate

17   discharges to waters of the United States, and therefore that a discharger is also enrolled under the

18   WDR cannot be a valid basis to terminate coverage under the General Permit.  The two permits

19   regulate different discharges, and even if Defendants were in compliance with the WDR, that

20   would not preclude them from needing coverage under the General Permit.

21          Defendants' arguments based on its pending, and as yet unapproved, Notice of

22   Termination is problematic for several reasons, not least of which is that if Defendants'

23   assumptions are correct, they will have terminated permit coverage *before* closing the facility and

24   selling off their herd.  Defendants contend, without citation to legal authority, that the Notice of

25   Termination, if approved, will apply retroactively to January 23, 2023.[4]  Thus, from January 23,

26

27   ───────────────────
     [4] Defendants' position appears to rest entirely on the legal conclusions of Paul Sousa and Michael
28   Mulas.  Plaintiff has objected to these declarations to the extent they make legal conclusions that
     are more appropriately left to this Court.  *See* Objection to Evidence Nos. 1-4, 7, and 8.

1   2023 to whenever Defendants eventually finish selling the herd and closing the facility, they will

2   have operated a Large CAFO without *any* NPDES permit.  This is, perhaps, why the Notice of

3   Termination form used by the Regional Board requires a certification that all closure activities be

4   *completed* before the Notice of Termination can be submitted, so that at the time of submission,

5   the discharger no longer needs coverage.  Defendants contend that they can terminate their permit

6   first, presumably just to avoid the consequences of this litigation, and then close their facility at

7   their leisure. This interpretation of the General Permit is unworkable for the reasons stated above,

8   and should be rejected by this Court.

9   **b.  The Complaint Contains Extensive Factual Allegations Setting Forth a Claim for Relief Under Clean Water Act § 505**

10  Defendants argue that Plaintiff's Notice Letter and Complaint fail to state a claim for

11  relief.  The Court must accept all plausible allegations as true and construe them in the light most

12  favorable to the claim.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  In order to

13  adequately state a claim for a violation under the Clean Water Act, Plaintiff must allege that (1) a

14  person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point

15  source (6) without a permit."  *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d

16  719, 754 (N.D. Cal. 2011) (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*,

17  13 F.3d 305, 308 (9th Cir. 1993)).  Plaintiff has alleged all six of these elements.

18  In addition to "discharge" violations, "it is settled that violations of a permit's

19  'requirements for retaining records of discharge sampling and for filing reports' can be the

20  subject of a Clean Water Act citizen suit.  *Inland Empire Waterkeeper v. Corona Clay Co.*, 17

21  F.4th 826, 832 (9th Cir. 2021) citing *NW Env't Advocs. v. City of Portland*, 56 F.3d 979, 988, 989

22  (9th Cir. 1995) ("[T]he plain language [of the Clean Water Act] authorizes citizens to

23  enforce *all* permit conditions.").  Where, as here, the discharger is subject to a NPDES permit, in

24  order to adequately state a claim for relief, Plaintiff must allege that a condition of Defendants'

25  permit was not complied with.  *Inland Empire Waterkeeper* 17 F.4th at 833.  Plaintiff has alleged

26  many different ways in which Defendants have failed to comply with the General Permit.

27  ***i.  Defendants Are "Persons" Under the Clean Water Act***

28  Defendants are "persons" under the Clean Water Act.  "The term 'person' means an

1   individual, corporation, partnership, association, State, municipality, commission, or political

2   subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5); *S.F. Baykeeper v. W. Bay*

3   *Sanitary Dist.*, 791 F. Supp. 2d 719, 754 (N.D. Cal. 2011). The term "person," in addition to the

4   definition contained in section 1362(5), includes any "responsible corporate officer." 33 U.S.C. §

5   1319(c)(6). The Complaint alleges that Defendant Mulas Dairy Company is a corporation

6   organized under California law, ECF No. 1 at ¶ 14, and that Defendant Michael Mulas is the

7   Chief Executive Officer of Mulas Dairy Company and also serves as its Agent for Service of

8   Process, *id.* at ¶ 15.[5]

9   ### ii.   Defendants' Discharges of Storm Water from Its CAFO Are "Discharges" Under the Clean Water Act

10   Under the Act, "[t]he term 'discharge of a pollutant' and the term 'discharge of pollutants'

11   each means (A) any addition of any pollutant to navigable waters from any point source, (B) any

12   addition of any pollutant to the waters of the contiguous zone or the ocean from any point source

13   other than a vessel or other floating craft." 33 U.S.C. § 1362(12). *S.F. Baykeeper*, 791 F. Supp. 2d

14   at 754. The Complaint alleges that Defendants discharge pollutants to navigable water from point

15   sources in a number of places. ECF No. 1 at ¶¶ 5, 12, 13, 46, 48, 51, 52, and 78-82.

16   ### iii.   Defendants' Storm Water Discharges Contain "Pollutants"

17   "Pollutants" are defined to include dredged spoil, solid waste, incinerator residue, sewage,

18   garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials,

19   heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and

20   agricultural waste discharged into water. 33 U.S.C. § 1362(6). The Clean Water Act also

21

22   [5] As the Chief Executive Officer and co-owner of, and the Legally Responsible Person for, the Mulas Dairy Company, Mr. Mulas has complete operational control over the facility's storm

23   water management. Thus, Mr. Mulas is a "responsible corporate officer," and is liable for Clean Water Act violations. *United States v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998) (holding that

24   a person may be held liable as a "responsible corporate officer" under the Clean Water Act "if the person has authority to exercise control over the corporation's activity that is causing the

25   discharges," and that there was no "requirement that the officer in fact exercise such authority or that the corporation expressly vest a duty in the officer to oversee the activity"); *Northern Cal.*

26   *River Watch v. Oakland Mar. Support Servs.*, No. C 10-03912 CW, 2011 U.S. Dist. LEXIS 14551, 2011 WL 566838, at *4 (N.D. Cal. Feb. 14, 2011) (explaining that under the CWA,

27   "penalties may be imposed against individuals who are in positions of authority at polluting companies") (citing *Iverson*).

28

1   identifies a Toxic Pollutant List at section 307(a)(1). 33 U.S.C. § 1317(a)(1). The Toxic

2   Pollutant List is found at 40 C.F.R. § 401.15. Among the toxic pollutants are lead, 40 C.F.R. §

3   401.15(44), and zinc. 40 C.F.R. § 401.15(65). In addition to toxic pollutants, conventional

4   pollutants are identified, including biochemical oxygen demand, total suspended solids, pH, fecal

5   coliform, and oil and grease. 40 C.F.R. § 401.16. The Complaint alleges that Defendants

6   discharge pollutants in a number of places. ECF No. 1 at ¶¶ 5, 8, 12, 13, 52, and 79. The Notice

7   Letter, incorporated by reference into the Complaint and attached thereto as Exhibit 1, identifies

8   various industrial materials commonly associated with dairy operations, including cow manure,

9   nutrients, and pathogens, as the specific pollutants that are likely to be in Defendants' discharges.

10  ECF No. 1-1 at 6. The Notice Letter also identifies the following pollutants discharged by

11  Defendants: total suspended solids, oil and grease, pH, and nitrate plus nitrite nitrogen. *Id.* 1-1 at

12  7.

13                    *iv.  Defendants Discharge Storm Water to Navigable Waters*

14          "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

15  Waters of the United States is defined at 40 C.F.R. § 120.2(a). Among the waters included in the

16  definition are tributaries to waters of the United States, *id.* at 120.2(a)(3), and wetlands that are

17  adjacent to waters of the United States, *id.* at 120.2(a)(4). The Complaint alleges that Defendants

18  discharge "into an unnamed creek, which drains to Schell Creek, then to Steamboat Slough,

19  which is a tributary of the Second Napa Slough, which discharges to Sonoma Creek and

20  ultimately to San Pablo Bay and the Pacific Ocean." ECF No. 1 at ¶ 5; *see also id.* at ¶ 48. The

21  Complaint alleges that each of the waters identified above are waters of the United States within

22  the meaning of the Clean Water Act. *Id.* at ¶¶ 6, 49.

23                        *v.  Defendants Discharge via Point Sources*

24          A "point source" is "any discernible, confined and discrete conveyance, including but not

25  limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock,

26  concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are

27  or may be discharged." 33 U.S.C. § 1362(14). Specifically, Defendants take issue with

28  Plaintiff's explanation of where the point sources at Defendants' dairy are located. ECF No. 23 at

7:16-18; 14:17-19.  Pursuant to EPA regulations, the Clean Water Act requires that a notice

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).  The Ninth Circuit has explained that,

> as long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement. The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.

*Tosco*, 309 F.3d at 1155.  Plaintiff provided sufficient information for Defendants to identify and correct the problem because Plaintiff identified with specificity the discharge points and point sources from which Defendants discharge polluted storm water.

Plaintiff's Notice Letter states that "MDC collects and discharges storm water associate with industrial activities at the Facility through at least three (3) discharge points into an unnamed creek, which drains to Schell Creek."  ECF No. 1-1 at 5.  In addition, Plaintiff's Notice Letter alleges that the dairy farm is a Large CAFO as that term is defined in the Code of Federal Regulations, 40 C.F.R. § 122.23.  ECF No. 1-1 at 5.  The Complaint also alleges that the facility is a Large CAFO.  ECF No. 1 at ¶ 41.  A CAFO is, by definition, a point source under the Clean Water Act.  33 U.S.C. § 1362(14).  As a CAFO, the facility itself is a point source, and the Complaint alleges that Defendants discharge from the facility.  ECF No. 1 at ¶¶ 5, 8, 48, 78, 79, and 83.

In addition, Plaintiff provided information about storm water samples that Defendants submitted to the Regional Board.  ECF No. 1-1 at 8.  These sample results identified the "Discharge Points" as "M-1" and "M-2" – the same terminology used by Defendants on the lab reports that they provided to the Regional Board in their reporting under the terms of the General Permit.  Defendants, not Plaintiff, are in a position to best know where "M-1" and "M-2" are located, and they cannot credibly argue that Plaintiff failed to provide sufficient information to know where those discharge points are located.  *See Tosco*, 309 F.3d at 1158 ("Tosco is obviously

1   in a better position than BayKeeper to identify the exact dates, or additional dates, of its own ship

2   loading”); *Paolino v. JF Realty, LLC*, 710 F.3d 31, 2013 U.S. App. LEXIS 5142, 2013 WL

3   951257, at *4 (1st Cir. Mar. 13, 2013) (“the appropriate measure of sufficiency under §

4   135.3(a) is whether the notice's contents place the defendant in a position *to remedy* the violations

5   alleged”).

6        In its Complaint, Plaintiff identifies the same information, and provides a color

7   photograph showing how the unnamed creek *runs through* Defendants dairy facility.  ECF No. 1

8   at ¶¶ 48, 50.  Paragraph 51 of the Complaint states “CSPA is informed and believes, and on that

9   basis alleges, that during every Significant Rain Event[6] storm water discharges from the

10  production area depicted above [¶ 50] into the unnamed creek.”  The Complaint continues,

11  “CSPA is informed and believes, and on that basis alleges, that during every Significant Rain

12  Event pollutants from the production area are discharged to the unnamed creek.”  *Id.* at ¶ 52.

13  Plaintiff has provided more than enough information for Defendants to identify and correct the

14  problem.

15             ***vi.   Defendants Discharge Storm Water in Violation of the Requirements of a***
               ***NPDES Permit***

16       Under the Clean Water Act, discharges to waters of the United States violate Section

17  301(a) unless authorized by Permit.  33 U.S.C. §§ 1311(a), 1342.  Compliance with a NPDES

18  permit is deemed compliance with the Clean Water Act.  33 U.S.C. § 1342(k).  The General

19  Permit is a NPDES permit, and therefore Defendants discharges must comply with the General

20  Permit, or some other NPDES permit in order to comply with the Act.  Moreover, Defendants

21  must comply with all requirements and conditions of the General Permit, as long as they are

22  subject to the General Permit.  *Inland Empire Waterkeeper*, 17 F.4th at 832-833.  The Complaint

23  alleges, in numerous places, that Defendants' discharges do not comply with the General Permit.

24  ECF No. 1 at ¶¶ 7, 8, 9, 78-83.  The Complaint also alleges, in numerous places, that Defendants

25  have failed to comply with the various procedural requirements of the General Permit, including

26  monitoring and reporting requirements.  *Id.* at ¶¶ 56-75, 87-89, 92-95, and 99-100.

27  _____

28  [6] A rain event totaling 0.1 inches or more of rainfall in a 24-hour period.  ECF No. 1 at ¶ 51, fn. 1.

1

### c.  The Matter Should Not Be Stayed

2        Defendants ask the Court to stay the matter until either one of two things happens: (1) the

3   Regional Board issues a decision with regard to Defendants' Notice of Termination; or, (2)

4   Defendants complete the sale of their herd and shut down the dairy operation.  ECF No. 23 at

5   17:20-24.  The moving party bears the burden of showing that a stay is appropriate.  *See Clinton*

6   *v. Jones*, 520 U.S. 681, 708 (1997).  Defendants have not met that burden here.  While the events

7   identified above may have an effect on capping the number of violations, neither event would

8   otherwise resolve this action.  That is, if the Regional Board does approve the Notice of

9   Termination, Defendants remain liable for all violations up to the date of termination.  And if

10   Defendants do actually remove the herd and close the facility, they still remain liable for each and

11   every violation up to the date of the closure.  *S.F. Baykeeper v. Tosco Corp.*, 309 F.3d at 1160.

12   Contrary to Defendants' arguments, neither of these events can moot or otherwise resolve this

13   case.

14        Defendants argue that "there is no possible damage that may result from the granting of

15   the stay" based on the contentions set forth to support their 12(b)(1) and 12(b)(6) arguments.

16   This argument fails for the same reasons each of those argument fails.  Defendants continue to

17   operate their dairy in violation of the General Permit, and will do so each day until their Permit is

18   terminated or the herd is sold and operation closed.  Staying the action to achieve one of those

19   outcomes does not change their liability and only serves to delay justice, which is contrary to the

20   imperative that the Federal Rules of Civil Procedure be "construed, administered, and employed

21   by the court and the parties to secure the just, speedy and inexpensive determination of every

22   action and proceeding. Fed. R. Civ. P. 1.  Staying this action also allows Defendants to continue

23   violating the Clean Water Act with impunity.

24        Defendants further argue, based on the unsupported declaration of Defendant Michael

25   Mulas, that Defendants have suffered a financial burden as a result of having to defend this

26   lawsuit.  This alone is not an adequate basis to support a stay.  *Lockyer v. Mirant Corp.*, 398 F.3d

27   1098, 1112 (9th Cir. 2005) ("being required to defend suit, without more, does not constitute a

28   clear case of hardship or inequity within the meaning of *Landis*") citing *Landis v. North American*

1   *Co.*, 299 U.S. 248 (1936).  The injury to Plaintiff, however, is ongoing so long as Defendants are

2   allowed to continue to violate the Clean Water Act.  ECF No. 1 at ¶¶ 11-13, and 16.

3          Defendants' third argument in support of a stay is that it would clarify the status of

4   Defendants' Notice of Termination and sale of the herd, and that this would have the effect of

5   simplifying the issues, proof and questions of law.  This argument fails for the same reason

6   Defendants' motion to dismiss fails, in particular, because Defendants remain liable for civil

7   penalties, and all violations up to the date the permit is terminated or the herd is removed from the

8   dairy.

9   **VI.    CONCLUSION**

10         Defendants' Motion is based on a flawed premise – that terminating their permit coverage

11  and/or closing the dairy will deprive this Court of jurisdiction to hear the claims brought by

12  Plaintiff, and allow Defendants to avoid the consequences of their years-long history of pollution.

13  For the reasons stated above, the Court should summarily deny Defendants' Motion.

14

15  Respectfully Submitted:

16  Dated: May 12, 2023                    LAW OFFICES OF ANDREW L. PACKARD

17                                         /s/ William Carlon
18                                         William N. Carlon

19                                         Attorneys for Plaintiff
20                                         CALIFORNIA SPORTFISHING
                                           PROTECTION ALLIANCE

21

22

23

24

25

26

27

28